



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Miranda Doxzon,                    :

      Plaintiff,                 :

v.                                 :    **Civil Action No:**

City of Philadelphia,   FILED      :    **JURY TRIAL DEMANDED**

      Defendant.                 :

---

## COMPLAINT

Plaintiff Miranda Doxzon brings this action against Defendant City of Philadelphia and in support thereof alleges as follows:

### Introduction

1.    Plaintiff Miranda Doxzon, a 19-year-old dependent youth from Philadelphia County with physical disabilities requiring the use of a wheelchair and mental health disabilities, seeks to compel Defendant City of Philadelphia through its Department of Human Services, to provide her with appropriate residential and non-residential services in the community, which is the most integrated setting appropriate to her needs. Instead, Miranda remains inappropriately placed in a segregated, institutional setting – where she was placed eight months ago supposedly on a five-day



emergency basis – in a program designed for individuals with moderate to severe intellectual disabilities, where she is isolated, has no non-disabled peers and is unable to engage in community life. Miranda remains in that unnecessarily segregated setting because Defendant has failed to locate or develop an appropriate placement for her.

2.     Since becoming responsible for providing her with a place to live in 2011, Defendant has placed Miranda primarily in institutional settings, including various residential facilities and psychiatric hospitals, despite her desire and ability with supports to live in the community as she was before being adjudicated dependent.

3.     Defendant knowingly, willfully and/or with deliberate indifference adopted and implemented policies and practices that exclude individuals with disabilities, including Miranda, from participating in its child welfare system by, *inter alia*, (a) unnecessarily institutionalizing her; (b) utilizing methods of administration that have the purpose or effect of substantially impairing accomplishment of the objectives of the child welfare system with respect to individuals with disabilities; and (c) failing to operate its services and programs so that, when viewed in their entirety, they are accessible to and usable by people with disabilities in violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.

2

§§ 12131-12134 and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.

4.      Due to her continued inappropriate and unlawful placement in an institutional setting, which has subjected her to segregation and isolation, Miranda has entertained thoughts of suicide and has had multiple psychiatric hospitalizations and has suffered and continues to suffer from, *inter alia*, anxiety, depression, fear, emotional distress, diminished self-esteem, mental anguish, embarrassment and humiliation.

5.      Plaintiff seeks appropriate declaratory and injunctive relief and compensatory damages.

### Jurisdiction and Venue

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, this being a case arising under the laws of the United States.

7.      Plaintiff's claims are authorized by 42 U.S.C. § 12101 *et seq.*, 29 U.S.C. § 794a and 28 U.S.C. §§ 2201 and 2202.

8.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to this action occurred in this district and the defendant resides in this district.

## Parties

9.     Plaintiff Miranda Doxzon, is a 19-year-old youth from Philadelphia, Pennsylvania who has multiple disabilities, including cerebral palsy, learning disabilities, epilepsy, depression, and post-traumatic stress disorder.

10.     Defendant City of Philadelphia is a Pennsylvania county of the first class.  16 P.S. § 201(1).  Defendant, through its Department of Human Services, is responsible to administer the child welfare system in Philadelphia, including the provision of necessary and appropriate services to adjudicated dependent youth.

## Factual Background

11.     Due to her cerebral palsy, Miranda Doxzon uses a wheelchair for mobility and needs assistance with activities of daily living, such as transferring to the toilet and shower and to her bed, dressing, cleaning, and doing laundry. In addition, she requires other durable medical equipment, such as a Hoyer lift, shower chair and hospital bed.  Miranda requires 16 hours of home health aide services daily.

12.     As a result of abuse and/or neglect allegations, Defendant has been involved in protecting and providing services to Miranda since at least 2010.

4

13. Until 2011, Miranda resided in Philadelphia with her parents and two siblings.

14. In November 2011, after Defendant obtained temporary legal custody of Miranda, Miranda was adjudicated to be a dependent child and was placed in the permanent custody of Defendant.

15. To date, Miranda remains in the custody of Defendant.

16. Defendant is responsible to provide child welfare services to dependent children in Philadelphia, like Miranda, including adequate substitute care to any child in need of such care. 62 Pa. Cons. Stat. Ann. § 2305; 55 Pa. Code § 3130.12(c).

17. Dependent children between the ages of 18 and 21 who continue to attend school, like Miranda, can remain in the child welfare system, entitled to services provided by Defendant. 42 Pa. Cons. Stat. Ann. § 6302.

18. The goal and purpose of the child welfare system is stability and permanency for dependent children, that is, minimizing the amount of time spent by the child outside of a permanent family setting. 42 Pa. Cons. Stat. Ann. § 6302. Services must be provided to children to achieve stability and permanency in the most integrated setting appropriate to the child's needs. *Id.*

5

19.    Defendant provides placements in foster homes, small group homes, and residential facilities for approximately 6,000 dependent children in Philadelphia.  Approximately 90% are placed in foster family homes or group homes in the community.  Defendant often fails to place youths with physical disabilities, such as Miranda, in homes in the community.

20.    Defendant has failed and continues to fail to place Miranda in a wheelchair accessible, community setting appropriate to her needs.

21.    On or about July 31, 2011, Miranda was placed in a behavioral health facility.

22.    On or about August 25, 2011, Defendant received a "Child in Hospital Alert," advising Defendant that Miranda was ready for discharge. Therapeutic foster care was recommended.

23.    Beginning in 2011, multiple service providers notified Defendant that they could not serve Miranda due to a lack of wheelchair accessible homes.  Indeed, in August and September 2011, at least eight of Defendant's providers informed Defendant that they had no wheelchair accessible home. Defendant improperly permitted providers to reject Miranda based on her disabilities or perceived disabilities.

6

24.    Although Miranda had been ready for discharge since approximately August 2011, Defendant did not identify or develop any appropriate, accessible, integrated placements.

25.    Instead, in or about October 2011, Defendant institutionalized Miranda at Woods Services ("Woods").

26.    Woods is a segregated, institutional setting situated on approximately 350 acres in Langhorne, Bucks County housing more than 650 individuals with severe developmental and intellectual disabilities. Many people at Woods have spent most of their lives institutionalized. Nearly all of Woods' services and supports are provided directly on its campus and not in the community.

27.    By at least February 2013, Defendant was informed that even Woods itself was requesting that Miranda be transferred to an appropriate placement.

28.    Again, Defendant failed to identify or develop any available wheelchair accessible community homes leaving Miranda to languish in an institution.

29.    Between approximately June 2013 and April 2015, Defendant placed Miranda in one or more group homes that, upon information and

7

belief, did not have appropriate equipment and/or services to meet Miranda's physical health needs.

30.    On or about April 14, 2015, Miranda was hospitalized for suicidal ideation.

31.    When she was ready for discharge by April 22, 2015, however, Defendant again failed to identify or develop an appropriate placement for Miranda, opting instead to unlawfully re-institutionalize her at Woods as an "emergency admission" on or about April 27, 2015.

32.    Defendant's Planned Placement referral document dated October 14, 2015 acknowledges that "Woods services is not spproperaite [sic] for Miranda" and that "Miranda would do better in a family home type placement with individual attention."

33.    Defendant has acknowledged, including in records dated October 22, 2015, that Miranda is not placed at Woods "due to IQ," but, instead, is institutionalized based on "medical." It is not clear what Defendant means by "medical" as Defendant's records describe only the need for assistance with activities of daily living.

34.    A note in Defendant's records dated April 18, 2016 confirms Defendant's continued awareness of its lack of physically accessible

8

community placements and the well-settled legal principle that "[w]e can't just keep [youth with physical disabilities] in institutions [full-time]."

35.    Defendant's records from July 2016 indicate that Miranda "desperately needs a family setting," but that Defendant had no homes "equipped even from a handicap accessibility standpoint."

36.    In or about October 2016, Defendant's records note that "this referral has been open for a year," but that Defendant had no available foster homes.

37.    In April 2017, Defendant's records indicate a concern about a lack of appropriate placement for Miranda, noting that "Miranda has been at Woods so long."

38.    In April 2017, Defendant's records continue to indicate a lack of wheelchair accessible homes and/or placement resources for Miranda due to her disabilities.

39.    Defendant's records dated May 2017 indicate that the "main barrier [to appropriate placement for Miranda] is to locate a wheelchair accessible home."

40.    On or about May 15, 2017, after years of improper and unlawful institutionalization, Miranda attended a medical appointment at the

Children's Hospital of Philadelphia ("CHOP") during which she said she would be suicidal if she were returned to Woods.

41.    CHOP admitted Miranda to the hospital for suicidal ideation and worsening depression.

42.    Defendant's records dated June 27, 2017 indicate that "CHOP did not realize how long it would take before Miranda is located another [placement].  CHOP now wants Miranda discharged."  Despite being ready for discharge, Miranda remained at CHOP because Defendant failed to identify or develop an appropriate placement.

43.    Miranda's hospital records reflect that by approximately the end of July 2017, she was "starting to express frustration with prolonged hospitalization and is eager to find a new home."

44.    Upon information and belief, on or about August 16, 2017, Miranda was transferred briefly back to the group home placement that did not have necessary equipment and/or services to support her before she was taken to St. Luke's Hospital emergency room with a report of self-injurious behavior.

45.    When Miranda was ready for discharge, Defendant failed to offer an appropriate placement to Miranda.  As a result, upon information

10

and belief, without a place for her to live, St. Luke's arranged for Miranda to be dropped off at Defendant's offices.

46.     On or about August 18, 2017, Miranda was again inappropriately placed at Woods, this time purportedly only on an emergency basis for five days.  Defendant's records dated August 22, 2017 indicate that "[s]he was placed there last week on a respite basis only.  She must leave the Woods this Friday."

47.     Once again, Defendant failed to identify or develop a community-based placement for Miranda.

48.     According to Defendant's records, in or about late August 2017, there was an opportunity for Miranda to be placed in a community home, but Defendant failed to have her timely evaluated by a physician so that orders could be written for necessary home health aide services.

49.     Defendant's records indicate that during this time Miranda was led to believe that her placement at Woods was for the duration of five days.

50.     In or about September 2017, while still institutionalized at Woods, Defendant's records indicate that Miranda reported that she was being abused at Woods to police and, after being interviewed by police, police concluded that Miranda made the abuse allegations "because her

11

[Department of Human Services] worker lied to her" about leaving Woods. Defendant continued to improperly institutionalize Miranda at Woods.

51.     In or about late November or early December 2017, Miranda was hospitalized due, upon information and belief, to suicidal ideation. Miranda remained in the emergency room for well over a week because she did not meet criteria for admission, but had nowhere else to go. Eventually, hospital staff permitted her admission so that she would have a room.

52.     Defendant's records indicate that by at least December 8, 2017, the hospital "wants Miranda out today."

53.     Defendant's records indicate that on December 12, 2017, Defendant was informed that "the hospital intends to transport Miranda to our Child care room."

54.     Defendant continued to unlawfully fail to provide appropriate placement for Miranda.

55.     When advocates contacted a provider previously approved by Defendant on Miranda's behalf to see if she could return to their care, the provider advised that there were no available wheelchair accessible homes.

12

56.    In the meantime, with the hospital eager to discharge Miranda given the absence of a medical need to keep her, Defendant pressured Miranda to return to Woods.

57.    Defendant's records dated December 12, 2017 indicate that "Miranda is going back to Woods with the plan that they are going to try to develop either a cottage for her or an apartment in the next few months."

58.    Without any other option, Miranda reluctantly agreed to return to Woods on or about December 19, 2017 based on Defendant's promise that her placement there would be short-term and temporary, only a month or so, while Defendant arranged for services for Miranda in an apartment in the community.

59.    On December 19, 2017, the Director of Integrated Clinical Consultations for DHS and Community Behavioral Health stated: "The apartment will be ready mid-January so this will make her feel that it won't be long."

60.    On December 27, 2017, referring to the apartment in the community for Miranda, DHS's Deputy Commissioner, Child Welfare Operations, stated: "I do not believe it will take a lot of time to make this placement a reality for Miranda, because we already have a contract with Woods."

61. On April 3, 2018, Miranda was taken to and ultimately admitted to CHOP after she reported entertaining thoughts of suicide prompted by her continued inappropriate institutionalized placement at Woods.

62. To date, although Woods agreed to develop a community home with appropriate services for Miranda, she remains improperly and unlawfully institutionalized at Woods.

63. Miranda has repeatedly requested to live in the community so she can learn to live as independently as possible and have opportunities to engage in community life.

64. Defendant has never offered Miranda a foster care placement in the community.

65. Miranda has been harmed and continues to be harmed by the unlawful isolation, segregation, and discrimination she has endured due to Defendants' violations of the ADA and RA. Defendant's actions and inactions have adversely impacted her mental and emotional health and well-being and caused her to miss out on socializing with her friends and engaging in other community-based activities.

14

## COUNT I

## Violation of Title II of the Americans with Disabilities Act

66.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

67.    On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101 *et seq.*, establishing a comprehensive civil rights law for the protection of persons with disabilities against disability based discrimination.

68.    In enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

69.    The ADA was intended to promote the full integration of persons with disabilities in the civic, educational, and commercial mainstream of society. In enacting the ADA, Congress made clear that it sought to ensure meaningful access and full participation of persons with disabilities in all community activities.

70.    Plaintiff is a qualified individual with a disability as defined by the ADA as she has physical, developmental, and mental impairments that

15

substantially limit one or more major life activities, including walking and
caring for herself, and she is otherwise qualified to receive services from
Defendant because she has been adjudicated dependent and is eligible to
remain in the child welfare system until the age of 21.  42 U.S.C. §
12102(1) and 12131(2); 28 C.F.R. § 35.108.

71.    Defendant is a public entity subject to Title II of the ADA.  42
U.S.C. § 12131(1); 28 C.F.R. § 35.104.

72.    Title II of the ADA requires, *inter alia*, that a public entity must
administer services, programs, and activities in the most integrated setting
appropriate to the needs of qualified individuals with disabilities. 42 U.S.C.
§ 12132; 28 C.F.R. § 35.130(d).

73.    The "most integrated setting" is one that "enables individuals
with disabilities to interact with nondisabled persons to the fullest extent
possible. . ." 28 C.F.R. § Pt. 35, App. A (2010); *see* Statement of the
Department of Justice on Enforcement of the Integration Mandate of Title II
of the Americans with Disabilities Act and *Olmstead v. L.C.*, available at
http://www.ada.gov/olmstead/q&a_olmstead.htm ("Integration Mandate").

74.    The Supreme Court has interpreted the ADA's Integration
Mandate, holding that Title II prohibits the unjustified segregation of people
with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999).  The Court

emphasized that the unjustified isolation of individuals with disabilities
"perpetuates unwarranted assumptions that persons so isolated are
incapable or unworthy of participating in community life" and that it
"severely diminishes the everyday life activities of individuals including
family relations, social contacts, work options, economic independence,
educational advancement and cultural enrichment." *Id.* at 600-01.

75.     In confining Plaintiff unnecessarily to segregated institutional
settings when she is appropriate for and wants to live in a more integrated,
community setting, Defendant has and continues to discriminate against
her in violation of the ADA.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

76.     Defendant also has and continues to discriminate against
Plaintiff on the basis of her disability in violation of the ADA, and its
implementing regulations, by excluding her from participation in and
denying her the benefits of its child welfare services and programs by, *inter
alia*:

a.      denying Plaintiff the opportunity to participate in and benefit
from Defendant's programs and services, including foster family
homes, community-based group homes and supported
independent living programs;

17

b.   failing to afford Plaintiff the opportunity to participate in or

benefit from child welfare services that are equal to those

afforded to others in that the services offered to her are in an

institutional setting that is not appropriate to her needs;

c.   providing Plaintiff residential child welfare services that are not

as effective in supporting her well-being and preparing her for

adulthood as those provided to others;

d.   providing Plaintiff a different and separate service than is

provided to others when such action is not necessary to provide

her with services as effective as those provided to others;

e.   limiting Plaintiff in the enjoyment of the rights, privileges,

advantages, and opportunities enjoyed by others receiving its

residential child welfare services;

f.   failing to make reasonable modifications to its policies,

practices and procedures in order to place Plaintiff in the most

integrated setting appropriate to her needs; and

g.   utilizing methods of administration that have the effect of

subjecting Plaintiff to discrimination on the basis of her

disabilities and have the effect of defeating or substantially

18

impairing and/or defeating accomplishment of the objectives of its child welfare services with respect to Plaintiff

42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1)(i)-(iv), (vii), (3).

77.    Defendant has and continues to violate the ADA by failing to operate its child welfare services and programs so that, when viewed in their entirety, they are accessible to and usable by people with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.150.

78.    Due to her continued inappropriate and unlawful placement in an institutional setting, which has subjected her to segregation and isolation, Miranda has entertained thoughts of suicide and has had multiple psychiatric hospitalizations and has suffered anxiety, depression, fear, emotional distress, diminished self-esteem, mental anguish, embarrassment and humiliation.

## COUNT II

## Violation of Section 504 of the Rehabilitation Act

79.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

80.    The RA prohibits discrimination on the basis of disability by any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).  Plaintiff is a person with a disability as defined by Section 504 as

19

she has physical, developmental, and mental impairments that substantially limit one or more major life activities, including walking and caring for herself, and she is otherwise qualified to receive services from Defendant because she has been adjudicated dependent and is eligible to remain in the child welfare system until the age of 21. 29 U.S.C. §§ 705(20) and 794; 28 C.F.R. §§ 41.31 and 41.32.

81.    Defendant receives federal financial assistance, including federal financial assistance to operate the child welfare program in Philadelphia, and is therefore covered by the RA. 29 U.S.C. § 794(b); 28 C.F.R. § 41.3(d).

82.    The RA requires that recipients of federal funds administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons. 29 U.S.C. § 794; 28 C.F.R. § 41.51(d); 45 C.F.R. § 84.4(b)(2).

83.    In confining Plaintiff to segregated institutional settings, Defendant has and continues to discriminate against her in violation of the RA, and its implementing regulations, by failing to administer the child welfare program in the most integrated setting appropriate to Plaintiff's needs. 29 U.S.C. § 794; 28 C.F.R. § 41.51(d); 45 C.F.R. § 84.4(b)(2).

84.   Defendant has and continues to discriminate against Plaintiff solely by reason of her disabilities in violation of the RA by excluding her from participation in and denying her the benefits of their child welfare services, including by, *inter alia*:

a.   denying Plaintiff the opportunity to participate in and benefit from Defendant's programs and services, including foster family homes, community-based group homes and supported independent living programs;

b.   failing to afford Plaintiff the opportunity to participate in or benefit from child welfare services that are equal to those afforded to others in that the only services offered to her are in an institutional setting that is not appropriate to her needs;

c.   providing Plaintiff residential child welfare services that are not as effective in supporting her well-being and preparing her for adulthood as those provided to others;

d.   providing Plaintiff a different and separate service than is provided to others when such action is not necessary to provide her with services as effective as those provided to others;

21

e.   limiting Plaintiff in the enjoyment of the rights, privileges, advantages, and opportunities enjoyed by others receiving its residential child welfare services;

f.   failing to make reasonable modifications to its policies, practices and procedures in order to place Plaintiff in the most integrated setting appropriate to her needs; and

g.   utilizing methods of administration that have the effect of subjecting Plaintiff to discrimination on the basis of her disabilities and have the effect of defeating or substantially impairing and/or defeating accomplishment of the objectives of its child welfare services with respect to Plaintiff.

29 U.S.C. § 794; 28 C.F.R. § 41.51(b)(1)(i-iv), (vii), (3); 45 C.F.R. § 84.4(b)(1)(i-iv), (vii), (2)-(4); 45 C.F.R. § 84.52(a).

85.   Defendant has and continues to violate the RA by failing to operate its child welfare services and programs so that, when viewed in their entirety, they are accessible to and usable by people with disabilities. 29 U.S.C. § 794; 28 C.F.R. § 41.57(a); 45 C.F.R. § 84.22(a).

86.   Due to her continued inappropriate and unlawful placement in an institutional setting, which has subjected her to segregation and isolation, Miranda has entertained thoughts of suicide and has had multiple

22

psychiatric hospitalizations and has suffered anxiety, depression, fear, emotional distress, diminished self-esteem, mental anguish, embarrassment and humiliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, respectfully requests that judgment be entered in her favor and against Defendant, together with the following relief:

   a.   Exercise jurisdiction over this case;

   b.   Declare that Defendant's actions and omissions as described above violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

   c.   Issue appropriate injunctive relief to enjoin Defendant from continuing to violate the Americans with Disabilities Act and Section 504 of the Rehabilitation Act and to compel Defendant to take appropriate steps to remedy its violations, including placing Plaintiff in a fully integrated, community-based residential setting with all appropriate services;

   d.   Award compensatory damages; and

   e.   Grant such other relief as may be just, equitable, and appropriate, including an award of reasonable attorneys' fees,

litigation expenses, and costs pursuant to 42 U.S.C. § 12205

and 29 U.S.C. § 794a(b).

## JURY DEMAND

Plaintiff demands a trial by jury for all claims at law.

Date:  April 5, 2018        By:   _Rocco Iacullo_

Rocco Iacullo (Att. ID No.:86144)
Koert Wehberg (Att. ID No.: 312848)
Disability Rights Pennsylvania
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4798
(215) 238-8070
(215) 772-3126 (fax)

Attorneys for Plaintiff